IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| SUE-ZANNE MANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv751-MHT |
| | ) | (WO) |
| JAMES A. DARDEN and | ) | |
| CAMILLE V. EMMANUEL, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

In this lawsuit, plaintiff Sue-Zanne Mann claims that
the police unlawfully tased her while she was in her
hospital bed.  She brings an excessive-force claim
against defendants James A. Darden and Camille V.
Emmanuel (two officers with the Prattville, Alabama
Police Department) for violating her rights under the
Fourth and Fourteenth Amendments to the United States
Constitution, as enforced through 42 U.S.C. § 1983, and
a claim against Darden for state-law battery.
Jurisdiction for the federal claim is proper under 28
U.S.C. §§ 1331 (federal question) and 1343 (civil

rights), and the state-law claim is properly before the court under supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

This case is currently before the court on the defendants' motion for summary judgment. For the reasons discussed below, the court agrees with the defendants' contention that Mann's § 1983 claim against both Darden and Emmanuel is time-barred; however summary judgment is denied on the battery claim against Darden.


## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in

favor of that party.  <u>Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Late in the evening of August 21, 2005, Mann, a 47-year-old woman, was taken to the emergency room after a friend became concerned for her health.  Mann, who had a history of medical issues, including heart problems, had taken a variety of drugs throughout the day due to both mental stress and physical pain.  She was particularly distraught over a fight between her husband and her teenage godchild (who had been living with Mann and her husband) in which her husband grabbed the girl by the arm and put her out of their house.

Mann's condition was such that she was moved from the emergency room to the intensive-care unit.  Her attending physician, concerned about potential suicidal ideation, obtained a court order to transfer her from the

intensive-care unit to a psychiatric-evaluation and treatment center.

The next morning, Mann became upset upon learning of the plan to transfer her to another facility for psychiatric evaluation. Prattville City Police were called to her room in the morning, and officers returned again in the afternoon in response to a call about Mann being disorderly. Mann was behaving abnormally, and she does not have a memory of events until shortly before the police arrived for the second time. Nonetheless, Mann had calmed down prior to the return of the officers and was not being disorderly when they arrived.

As officers arrived at the intensive-care unit in the afternoon, Mann's husband was told to leave her room. Officer Darden informed Mann that doctors had a court order to take her to the psychiatric facility and that he had come to make sure that she went there. She protested that she did not want to be transferred and asked why she had to be moved. While Officer Emmanuel watched, Darden

4

brandished his taser and warned Mann, who was in her hospital bed, that if she did not comply with his orders, calm down, and prepare to go with the medics to the psychiatric facility, he would tase her.

After this warning, Darden tased Mann as she lay in her bed.  After the first tasing, Darden told Mann to be still or he would tase her again.  As Mann sat on the bed, she reached for the wires attached to the two prongs of the taser that were now implanted in her stomach. Darden then tased her again.

Each act of tasing involved electric current injected into Mann for five seconds.  Darden's taser model apparently functioned by shooting small prongs that penetrated the body of the tasered person and remained connected to the gun.  Thus, when Darden tased Mann again, he simply reinjected electric current through the wires and into the prongs that were still implanted in Mann's stomach; new prongs were not fired the second time Darden tased Mann.

5

The Taser Use Report filed by Darden includes a section in which the officer is asked to describe the type of force displayed by the subject. Darden described the force used by Mann as "noncompliance and passive resistance." Defs.' Mot. Summ. J. (Doc. No. 31), Ex. 10.

After the second tasing, Mann was taken to the psychiatric facility without further incident and released the next day. Mann's wounds from the taser's prongs became infected, and the prongs also damaged mesh implanted in the area of Mann's abdomen from a prior surgical procedure. This mesh had to be surgically repaired as a result of the tasering incident.

Mann was originally charged with disorderly conduct arising out of the incident in the intensive-care unit, but she was never prosecuted. In fact, the report filed by Darden on the same day of the incident indicates that the case had already been closed, citing lack of prosecution.

### III. DISCUSSION

#### A. § 1983 Claim Against Darden and Emmanuel

Defendants Darden and Emmanuel urge summary judgment on Mann's § 1983 claim for reasons relating to both procedure and the merits. The court begins with the procedure and finds that it cannot reach the substance.

The defendants first argue that Mann's claim is barred by the statute of limitations. The parties do not dispute that the statute of limitations for Mann's § 1983 claim is two years. See Owens v. Okure, 488 U.S. 235 (1989) (holding that § 1983 claims look to the general state-law limitations statute for personal-injury actions); 1975 Ala. Code § 6-2-38(l) (providing for a two-year statute of limitations for personal-injury actions).

Mann timely filed this action on August 22, 2007, the last day before the statute would have run under Alabama law. The original complaint described each of the defendants as police officers with a numbered designation

7

and a description of the time, place, and nature of their respective conduct rather than their given names.  When Mann filed this suit, she also filed a motion seeking early discovery for the purpose of uncovering the actual names of the officers who participated in her tasing. That motion was granted on August 29, 2007.

The names 'Darden' and 'Emmanuel' were not used to describe the defendants in this case until the amended complaint was filed in March 2008, after Mann had obtained early discovery, had subpoenaed records from the Prattville Police Department in January 2008, and had verified the identity of the officers against whom she had brought the complaint.  The defendants argue that Mann's amended complaint does not 'relate back' to her original timely filing.  As a result, they argue, the two-year statute of limitations has run.

The parties identify two possible avenues pursuant to which an amendment could properly 'relate back' to the timely filing of an original complaint: (1) Federal Rule

8

of Civil Procedure 15(c)(1)(A); and (2) Federal Rule of
Civil Procedure 15(c)(1)(C).

The latter of these options, Rule 15(c)(1)(C), is
inapplicable to save Mann's federal claim.  The parties
argue extensively about the application of Rule
15(c)(1)(C), which requires, among other things, "a
mistake concerning the proper party's identity."
Fed.R.Civ.Pro. 15(c)(1)(C)(ii).  Mann's ignorance of the
proper defendants, however, does not qualify as a
"mistake."  <u>Wayne v. Jarvis</u>, 197 F.3d 1098, 1103 (11th
Cir. 1999) ("While we have stated that we read the word
'mistake' in Rule 15(c) liberally, we do not read the
word 'mistake' to mean 'lack of knowledge.'") (internal
quotations and citation omitted).  As a result, Mann
cannot use Rule 15(c)(1)(C) to substitute real names for
fictitious names because, here, the reason is ignorance
rather than some type of error.[1]

---

1.  Moreover, even if Mann's lack of knowledge were
encompassed by the rule's use of the word "mistake," Rule
15(c)(1)(C)(ii) requires that the defendants be
(continued...)

The former, Rule 15(c)(1)(A), requires more discussion.  The rule provides that an amendment relates back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back."  Fed.R.Civ.P. 15(c)(1)(A).  In Saxton v. ACF Industries, 254 F.3d 959 (2001), the Eleventh Circuit Court of Appeals "consider[ed] whether Federal Rule of Civil Procedure 15(c)(1) incorporates state law relation-back rules when state law provides the statute of limitations for the claims."  Id. at 960.  The court found that it does.  (Currently, the specific portion of the rule discussed in Saxton--and the portion

1.  (...continued)
chargeable with knowledge of that mistake such that they knew that, but for the mistake, they would have been sued.  See, e.g., Powers v. Graff, 148 F.3d 1223, 1228 (11th Cir. 1998).  Mann has not presented evidence countering the defendants' assertion that they never found out about the suit until the amended complaint was filed and served.  Nor has Mann made a showing that the defendants should have known about the suit; indeed, she did not, for example, name the City of Prattville, its Police Department, or any other generic party as a defendant, and there was, as a result, no way for the defendants to have learned by other means that they should have been included as well, but for a mistake.

10

of the rule at issue here--is numbered 15(c)(1)(A) instead of 15(c)(1), as the rule was referred to in Saxton.)

The defendants correctly note that Saxton was a case involving diversity-of-citizenship jurisdiction, but the defendants do not offer any reason that Saxton's holding does not apply equally to federal-question cases in which state law similarly provides the applicable statute of limitations.  To the contrary, Rule 15(c)(1)(A) and the relevant cases compel this result.

The Notes accompanying the relevant part of Rule 15--after indicating that the rule is designed to allow relation back permitted under whatever the applicable limitations law and mentioning diversity cases--state:

> "If federal jurisdiction is based on a federal question, the reference may be to the law of the state governing relations between the parties. ... Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim."

11

Notes of Advisory Committee on 1991 Amendments (internal citations removed).   Thus, Rule 15(c)(1)(A) clearly contemplates application in certain federal-question cases, and the Notes make clear that Saxton's general holding is meant to include federal-question cases in which state law provides the statute of limitations. Indeed, one of the cases Saxton pointed to in supporting its holding that courts apply the relation-back rules of the State providing the limitations statute was a Fifth Circuit Court of Appeals case, McGregor v. Louisiana State Univ. Bd. of Supervisors, 3 F.3d 850, 863 n.22 (1993), in which jurisdiction was based on a federal question.

This result is also strongly supported by Board of Regents v. Tomanio, 446 U.S. 478 (1980).   In that case, the Supreme Court held that, in § 1983 suits, state rules regarding how to toll limitations periods must be applied in addition to state statutes of limitation.[2]   Id. at 483-

_____

2.   The court in Tomanio, after deciding that New
(continued...)

12

86.   The connection between using a statute of
limitations and using the concomitant rules regarding
tolling that statute recognizes that "[a]ny period of
limitation ... is understood fully only in the context of
the various circumstances that suspend it from running
against a particular cause of action."   Id. at 485
(quoting Johnson v. Railway Express Agency, 421 U.S. 454,
463 (1975)).   Thus, if Alabama law supplies the relevant
statute of limitations for Mann's claim, Rule
15(c)(1)(A)'s directive to look also to Alabama law
regarding when that limitations period may, in effect, be

---

    2.   (...continued)
York's tolling rules should apply, further analyzed
whether that application would be inconsistent with
federal law.   This analysis is unnecessary here because
the relevant federal procedural rule itself directs the
court to look at state relation-back rules when they can
be employed to save the claim.   Moreover, Rule
15(c)(1)(A) applies only when the state relation-back
rules would save a claim that would otherwise lapse under
the federal rules, and thus Rule 15(c)(1)(A) cannot be
inconsistent with the policies that § 1983 seeks to
vindicate.

suspended makes a great deal of sense.[3]  In other words,
<u>Tomanio</u> and <u>Johnson</u> make clear that, because state law
determines how long a claim will be valid based on state
policy, state law may also inform what kind of behavior
or circumstances impact the ultimate length of that
period by, for example, providing exceptions to it based
on state policy.  <u>See Johnson</u>, 421 U.S. at 464 ("In
borrowing a state period of limitation for application to
a federal cause of action, a federal court is relying on
the State's wisdom in setting a limit, and exceptions

---

3.    Other aspects of § 1983 claims, including the
accrual date of a § 1983 cause of action, remain purely
questions of federal law not resolved by reference to
state law.  <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007).
This distinction also makes sense.  Because federal
constitutional claims likely involve elements different
from those in state-law causes of action from which they
borrow statutes of limitations, courts should look to
federal law to determine the moment at which the elements
of the claim are met, thus beginning the limitations
clock.  However, rules regarding the mechanics of the
running of that clock are a different matter, and the
Supreme Court has logically decided that, like the clock
itself, those rules are provided by reference to state
law.

14

thereto, on the prosecution of a closely analogous claim.").[4]

The defendants nonetheless contend that Rule 15(c)(1)(A) cannot save Mann's claim because federal procedure simply does not allow for 'fictitious party' pleading.  This contention is incorrect.

First, while there is no bright line, some distinction can be made between suing a party that is truly a fiction and suing a party that is real but

---

4.  Admittedly, Tomanio is distinguishable from both Saxton and Mann's case because tolling rules are not the same thing as relation-back procedures, even if relation-back procedures operate in certain instances as the functional equivalent of a tolling mechanism.  Thus, while the Eleventh Circuit in Saxton and the Supreme Court in cases following Tomanio (for example, in Schiavone v. Fortune, 477 U.S. 21 (1986)) applied the federal relation-back procedures even when state law provided the statute of limitations, the principles behind Tomanio's decision to apply state tolling rules are still instructive in demonstrating why, even were it not for the unambiguous Notes to Rule 15, Saxton's holding interpreting Federal Rule 15 should clearly apply to cases involving a federal question.  Indeed, the Notes to Rule 15(c)(1)(A) cite to Tomanio, and the logic behind Tomanio discussed above helps explain the general policies underlying the relationship between federal and state law in this area.

referring to that party by a 'fictitious name.'  As the Eleventh Circuit has noted, "It is important to distinguish suing fictitious parties from real parties sued under a fictitious name.  There may be times when, for one reason or another, the plaintiff is unwilling or unable to use a party's real name.  Also, one may be able to describe an individual (e.g., the driver of an automobile) without stating his name precisely or correctly."  Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992) (quoting Bryant v. Ford Motor Co., 832 F.2d 1080, 1096 n. 19 (9th Cir. 1987) (Kozinski, J., dissenting).  Therefore, plaintiffs can use fictitious names for real defendants when it appears that, for example, discovery will uncover the defendant's actual name.  Dean, 951 F.2d at 1216 (citing Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)).[5]  This is

_____

    5.  Moreover, there is a further difference between using fictitious names that clearly identify an individual (such as "the Governor of Alabama" or "the Sheriff of Montgomery County") which allows for easy identification and service of process, and using (continued...)

16

what Mann sought to do here.

Second, <u>Saxton</u> itself, in which the plaintiffs originally named fictitious defendants, contradicts the defendants' position.   In <u>Saxton</u>, after outlining the criteria for using fictitious names for relation-back purposes in Alabama, the Eleventh Circuit remanded to the district court to decide whether the substitution of the real name of a defendant met the requirements of Alabama's fictitious-party-practice rule.   254 F.3d at 964-66.  The fact that <u>Saxton</u> was a diversity case again makes no difference here, particularly given the defendants' unsupported argument that the federal rules categorically prohibit fictitious-party pleading in all cases.   <u>Saxton</u>, at the very least, stands for the proposition that fictitious-party pleading may be allowed

---

5.  (...continued)
fictitious names that describe a defendant but may not allow as easily for notice of the action to reach that defendant.   <u>See</u> <u>Dean</u> 951 F.2d at 1216 & n.6.   In those cases in which the description clearly identifies the party, any fictitious name employed may very well be "surplusage."   <u>Id</u>.

when such a practice is recognized by the law of the State whose relation-back principles are controlling-- although there is no indication that such an interpretation of, or limitation on, its reasoning and holding is warranted.

Indeed, the use of fictitious names in federal-court pleadings, while not ideal, is both commonplace and sensible.[6] See Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980) (allowing use of fictitious names unless "it is clear that discovery would not uncover the identities" and citing cases); see also Dean, 951 F.2d at 1216 (citing Gillespie's comment with approval); Wright & Miller, Fed. Prac. & Proc. § 1321 at 382 (3d ed. 2004) ("When a plaintiff is ignorant as to the true identity of a defendant at the time of filing the complaint, most federal courts typically will allow the use of a

_____

6. The court is aware of only one context in which fictitious party practice is not permitted. In removal cases, for obvious reasons, 28 U.S.C. § 1441(a) directs courts to disregard the citizenship of "defendants sued under fictitious names."

18

fictitious name in the caption so long as it appears that the plaintiff will be able to obtain that information through the discovery process....").  Here, Mann did not know the identity of the police officers involved in the tasing incident in the intensive-care unit (or, perhaps, to what law-enforcement department they belonged), but she identified and described them based on their conduct and subsequently verified their actual names in the course of discovery.  A blanket rule prohibiting such a commonly used practice--a practice of potentially crucial importance for some plaintiffs who have suffered an injury but cannot easily or quickly discern its direct source--would make little sense as a matter of procedure and raise serious questions as a matter of fairness.

This is not to suggest, of course, that fictitious-party pleading, invoked in the name of prudence and fairness to plaintiffs, is to be employed in a manner that flouts procedural rules designed to insure fairness to defendants; the point, simply, is that a reasonable

balance must be struck between the two.  With that in mind, the court now turns to whether, under the circumstances, Mann's substitution of Darden and Emmanuel for their fictitious alter egos was timely under the relevant Alabama rules regarding relation back of amendments.

Alabama's fictitious-party provision, Ala. R. Civ. Pro. 9(h), provides that, "When a party is ignorant of the name of an opposing party and so alleges in the party's pleading, the opposing party may be designated by any name, and when that party's true name is discovered, the process and all pleadings and proceedings in the action may be amended by substituting the true name."  As Saxton notes, the commentary to Rule 9(h) references Ala.R.Civ.P. 15(c)(4), which provides that, "An amendment of a pleading relates back to the date of the original pleading when ... relation back is permitted by principles applicable to fictitious party practice pursuant to Rule 9(h)."  The combination of these rules

"allow[s] a plaintiff to avoid the bar of a statute of limitations by fictitiously naming defendants for which actual parties can later be substituted." Saxton, 254 F.3d at 965 (quoting Jones v. Resorcon, 604 So.2d 370, 372 (Ala. 1992)).  As stated by Saxton, a plaintiff can avoid the bar of the statute of limitations if: (1) the original complaint adequately described the fictitious defendant; (2) the original complaint stated a claim against the fictitious defendant; (3) the plaintiff was ignorant of the true identity of the defendant; and (4) the plaintiff used due diligence to discover the defendant's true identity.  254 F.3d at 965 (citing Jones, 604 So.2d at 372-73).

There can be no dispute that Mann's original complaint adequately described the fictitiously named defendants and stated a claim against them.  Even though Darden and Emmanuel do not make any arguments pursuant to Alabama relation-back doctrine, they clearly argue elsewhere, however, that Mann should have known their

21

identities and was not diligent in pursuing their names.
Specifically, Darden and Emmanuel argue that Mann did not
subpoena records from the Prattville Police Department
until January 2008, five months after filing her
complaint.   Moreover, they argue that attorneys
representing Mann met informally with the Prattville
Chief of Police as early as February 2007, at which time
the Police Chief read them the Taser Usage Report
describing the incident.

The standard for determining whether Mann exercised
due diligence is whether she "knew, or should have known,
or was on notice, that the substituted defendants were in
fact the parties described fictitiously."   <u>Jones</u>, 604
So.2d at 373 (quoting <u>Davis v. Mims</u>, 510 So.2d 227, 229
(Ala. 1987)).   Under this standard, a plaintiff is
required to pursue diligently information that is being
withheld, including seeking court-ordered access.   <u>Id</u>.

Under this (or, indeed, any) standard of due
diligence, Mann has not met her burden.   Mann's counsel

22

met in February 2007 with the Prattville Chief of Police.
At that meeting, the Police Chief read the Taser Usage
Report to Mann's counsel--a report that includes the last
names and initials of both Officers Darden and Emmanuel
and describes their roles in the incident.    Mann's
counsel countered this evidence at oral argument, stating
that this meeting was purely informal and was not for the
purpose of discovering the identity of the officers
involved.   Mann's counsel further stated that the Police
Chief refused to give him a copy of the report (or show
it to him).   Counsel could not recall if the portion that
the Police Chief read orally included the names of the
officers.

    Mann filed her complaint on August 22, 2007, and was
granted early discovery on August 29, 2007.    Even
assuming the Police Chief's conduct had not permitted her
and her counsel to know the names of the officers prior
to the time of that filing (something about which Mann
has not provided any evidence), the court is convinced

that Mann could have, at that moment, requested interrogatories or sought the information through subpoena. Instead, Mann waited five months, until late January 2008, to subpoena records from the Prattville Police Department. At no time during this period did Mann otherwise notify the Police Department or anyone connected with the potential defendants about the suit or otherwise request any additional information. This conduct is all the more inexplicable because counsel for Mann knew that a police report describing the incident (and the identities of those involved) existed as early as February 2007.

Counsel for Mann has not even attempted to offer a justification for this five-month delay. The only reason offered by counsel is that he was, at that time, working alone on the case. Obtaining police records using a subpoena (or even, for example, simply informing police of the existence of the suit) is, however, clearly not

**24**

the kind of complex activity that would require assistance from other counsel.

Thus, the court cannot find that Mann exercised due diligence in pursuing the identity of the defendants. Under Alabama law, the court is not permitted to excuse this delay in the interests of justice, even given the egregious and intentional nature of the allegations in this case.  As a result, Mann's claim under § 1983 is time-barred, and summary judgment will entered in favor of Darden and Emmanuel on this claim.


## B. Battery Claim Against Darden

Officer Darden does not contend that Mann's state-law battery claim is time-barred.  See 1975 Ala. Code § 6-2-34(1) (establishing a six-year statute of limitations for any trespass to person or liberty, including assault and battery).  Therefore, the court will address the claim on the merits.

In order to prevail on a claim of battery, Mann must establish: (1) that Darden touched her; (2) that Darden intended to touch her; and (3) that the touching was conducted in a harmful or offensive manner.  <u>Ex parte Atmore Community Hosp.</u>, 719 So.2d 1190, 1194 (Ala. 1998). None of these elements is in dispute.  The real dispute between the parties concerns whether Darden is entitled to "discretionary function" immunity.

Alabama law provides immunity for police officers engaged in a "discretionary function."  1975 Ala. Code § 6-5-338.  This term generally incorporates "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances."  <u>Wright v. Wynn</u>, 682 So.2d 1, 2 (Ala. 1996).

## i.

The Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause. <u>Borders v. City of Huntsville</u>, 875 So.2d 1168, 1180 (Ala. 2003) (reversing summary judgment on claims of excessive force, false arrest, false imprisonment, and assault and battery). Thus, if a reasonable officer could not have believed that he had probable cause to arrest, then there is no discretionary-function immunity. <u>Id</u>. at 1181.

Darden argues that he had arguable probable cause to use his taser against Mann. He does not, however, consistently link this statement of arguable probable cause to any particular violation of the law. Although he originally charged (and immediately dropped) disorderly conduct under 1975 Ala. Code § 13A-11-7,[7]

_____

7. Disorderly conduct is defined in 1975 Ala. Code
(continued...)

27

Darden's asserted explanations of his taser use suggest

---

7.  (...continued)
§ 13A-11-7:

> "(a) A person commits the crime of
> disorderly conduct if, with intent to
> cause public inconvenience, annoyance or
> alarm, or recklessly creating a risk
> thereof, he:
>
> (1) Engages in fighting or in violent
> tumultuous or threatening behavior; or
>
> (2) Makes unreasonable noise; or
>
> (3) In a public place uses abusive or
> obscene language or makes an obscene
> gesture; or
>
> (4) Without lawful authority, disturbs
> any lawful assembly or meeting of
> persons; or
>
> (5) Obstructs vehicular or pedestrian
> traffic, or a transportation facility;
> or
>
> (6) Congregates with other person in a
> public place and refuses to comply with
> a lawful order of the police to
> disperse."

Based on the police report, it appears that Darden
charged this offense because of Mann's use of obscene
language, her level of noise, and her potentially
threatening behavior.  Mann denies that any of this took
place after the arrival of the officers.

28

that he may have employed the taser because Mann refused to obey his orders or because Mann was physically threatening Officer Emmanuel. Neither of these putative offenses was ever charged. Moreover, Mann disputes the facts upon which Darden bases his assertion that she was being disorderly or threatening after he and Emmanuel arrived on the scene. <u>See</u> 1975 Ala. Code, § 15-10-3(a)(1) (granting officers authority to arrest a person without a warrant for "any public offense committed or breach of the peace threatened <u>in his presence</u>"). Mann testified that she was not shouting obscenities at officers--a fact consistent with her husband's testimony--or engaging in threatening behavior but was, rather, laying in her hospital bed the entire time. Instead of refusing to obey an alleged order, Mann testified that she asked why she had to go to the psychiatric facility and told the officers that she did not want to go. Thus, there is a real dispute concerning whether Darden had arguable probable cause for charging

29

disorderly conduct (or any other offense), let alone for using the extreme level of force to which he then resorted for any of the reasons he has, at various times, put forward.  As the Alabama Supreme Court has held, "before any force can be used in making an arrest, probable cause must exist to make a lawful arrest." Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala. 1995).  Because the facts that would enable a determination of arguable probable cause to be made are in genuine dispute, Darden is not entitled to immunity for the force used in the course of the incident that led to Mann's disorderly conduct charge.

Even if Mann's testimony did not establish genuine issues of dispute, the other evidence--including the evidence provided by Darden--is internally inconsistent and could allow a jury to find that there was no arguable probable cause.

More than one potential theory has been advanced, at times, to justify the tasing.  First, although Darden

argues that Mann was being disorderly, his own Taser
Usage Report describes the type of force displayed by
Mann as "noncompliance and passive resistance."  Defs.'
Mot. Summ. J. (Doc. No. 31), Ex. 10.  While the Chief of
Police states in his affidavit that, "based on the
information" he received, Mann was tased "because of her
disorderly conduct," Defs.' Mot. Summ. J. (Doc. No. 31),
Ex. 5, this is contradicted by Darden's own reports that
Mann was tased because she reached for the curtains
around her bed after he told her not to.  Moreover,
Darden tased Mann again, this time while she lay on her
hospital bed; the fact that Darden tased Mann a second
time while she was not being disorderly could allow a
jury to doubt his already inconsistent explanation for
the first tasing.

　　　Second, while Darden also argues that he employed his
taser for "officer safety" in order to protect Officer
Emmanuel from a potential assault by Mann, this assertion
is also inconsistent with his own reports.  Darden

indicated at the time of the incident and in his affidavit that Mann repeatedly insisted on closing her privacy curtains as officers stood around her bed in her hospital room, stated that she was getting up to close the curtains, and then reached over Officer Emmanuel to grab the curtains. Darden argues that he warned Mann not to grab the curtains prior to tasing her, but this assertion is itself inconsistent with the subsequently asserted threat to officer safety. Moreover, Mann and Emmanuel's testimony indicates that, prior to Mann ever allegedly attempting to get up and reach for the curtains, Darden took out his taser and warned Mann that if she did not comply with his orders to calm down and get dressed, he would tase her. Furthermore, as noted before, Darden tased Mann again for an additional five seconds as she lay back on her bed, some distance away from Officer Emmanuel. Indeed, his own report mentions the force used by Mann as "noncompliance and passive resistance," a characterization totally inconsistent with

the position he now asserts concerning the threat to Officer Emmanuel.  Based on this information, a jury could find that Darden did not tase Mann because of an imminent threat to "officer safety."

Third, to the extent such a theory is suggested, the evidence is inconsistent with the use of the taser connected to Mann's failure to obey Darden's verbal orders.  In addition to the inconsistent facts described above, even assuming Mann exhibited "passive resistance" and was angry and loud, the evidence does not establish that she had been violent in any way that would justify the repeated use of a taser for failing to obey an order. Moreover, Darden does not now attempt to offer any argument that would justify the use of a taser against a hospital patient in her bed who simply refused to obey a verbal order to calm down, get dressed, and prepare for transfer to a psychiatric facility.  Indeed, Darden does not point to any crime arguably committed by Mann in ignoring those specific commands for which he would have

had arguable probable cause to seize her in any way.  Cf.
1975 Ala. Code § 32-5A-4 (directing that no person
"willfully" refuse to comply with a "lawful" order of
someone with the authority to regulate traffic); Sly v.
State, 387 So.2d 913, 915 (Ala. Cr. App. 1980) (noting
that the statute requiring obedience of lawful traffic
orders "Was not intended to, does not, and cannot give
police officers unbridled power to arrest for refusal to
obey any order they may choose to direct at a citizen").


## ii.

Nonetheless, despite the absence of arguable probable
cause, two other theories of justification are at least
arguably implicated by the record in this case.  First,
the court order obtained by the doctor to confine Mann at
the hospital for treatment could have arguably given
Darden cause to detain her as necessary to carry out the
court order, regardless of whether Mann was committing a
crime.  Second, while responding to a hospital room in an

**34**

emergency situation, Darden could have been acting as a "community caretaker" entitled to take appropriate steps to ensure the safety of Mann and others rather than as a police officer merely enforcing criminal laws.  See, e.g., Cannon v. State, 601 So.2d 1112, 1115 (Ala. Cr. App. 1992) (recognizing that police perform a "community caretaking function" completely divorced from pursuing violations of criminal statutes); Duck v. State, 518 So.2d 857, 859-60 (Ala. Cr. App. 1987) (noting that police can have a right to respond to citizen complaints and to help those in need of immediate aid); Winters v. Adams, 254 F.3d 758, 760-764 (8th Cir. 2001) (explaining the authority of police to seize an individual for the safety of the individual or the public pursuant to the community caretaking function of police officers); Tinius v. Carroll County Sheriff Dep't, 321 F. Supp. 2d 1064, 1074 (N.D. Iowa 2004) (Bennett, J.) (collecting cases). In neither of these two situations would Darden have needed probable cause that Mann was committing a criminal

violation to employ some reasonable amount of force to accomplish his lawful objectives. However, Darden advances neither of these reasons as the basis for his actions.

### iii.

Even if, however, Darden were properly acting to enforce a court order or in his capacity as a community caretaker or if, contrary to the above discussion, arguable probable cause existed, Darden would not be entitled to discretionary-function immunity for the repeated use of his taser against Mann as she lay in her hospital bed.

Borders held that officers do not have discretion, in the exercise of their judgment, to make an arrest if there is no arguable probable cause. Borders v. City of Huntsville, 875 So.2d 1168, 1180 (Ala. 2003). Similarly, the question for Mann's battery claim is whether any reasonable officer could have believed the use of that

36

level of physical force was justified during the
incident.  If not, then Darden was not acting in his
discretionary authority in effectuating the arrest or in
otherwise responding to the situation.  Cf. Franklin, 70
So.2d at 852 ("[T]he motion for summary judgment should
have been granted only if Franklin presented no
substantial evidence to create a genuine issue of
material fact as to whether probable cause existed to
make a lawful arrest or as to whether the force used was
excessive.")  Indeed, Franklin, a case relied upon by
Borders, notes that 1975 Ala. Code § 13A-3-27 makes
officers liable if they use more than a reasonable amount
of force in making an arrest (or, presumably, in
protecting another person).  Id. at 852.  This makes
clear that, much like making an arrest without arguable
probable cause, using an unreasonable amount of force is
not within the discretion of an officer.  See id.  Thus,
consistent with Borders, if the evidence seen in the
light most favorable to Mann suggests that no reasonable

officer could have thought the degree of force was acceptable, then Darden was not acting within his discretion and is not entitled to discretionary-function immunity. While the use of force is typically within the discretion of an officer when enforcing the peace, caring for the community, or making an arrest, the use of unreasonable and egregious levels of force is not.[8]

---

8.   The court notes that, under federal qualified-immunity analysis, the "discretionary function" or "scope of discretionary authority" analysis is typically examined from the perspective of a different level of generality. In the federal context, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." Harbert Int'l v. James, 157 F.3d 1271, 1283 (11th Cir. 1998). Thus, an officer engaging in an arrest (that is, the act complained of)--even one without arguable probable cause--would be acting within discretionary authority and could invoke qualified immunity unless the officer violated a clearly established constitutional right. Cf., e.g., Skop v. City of Atlanta, 485 F.3d 1130 (11th Cir. 2007) (holding that no arguable probable cause existed but recognizing that it was undisputed that the police officer was acting within his discretionary authority). This conceptual approach, embraced by federal courts in their analysis of the analogous issue of qualified immunity for constitutional torts, has not been embraced by the Alabama courts, as evidenced by Borders.

Here, reading the facts in Mann's favor, the court is convinced that the evidence could support the conclusion that Darden used grossly unreasonable force.[9] Prattville's own guidelines for officer taser usage confirm the reasonable proposition that the taser is, at a minimum, to be employed as a reaction to "control a dangerous or violent subject when it is reasonable to do so," Defs.' Supplement (Doc. No. 60) at 4-8, rather than as a punishment simply to force a noncompliant subject into obedience.  A jury could find that no reasonable officer could have considered it appropriate to respond to Mann's conduct by repeatedly employing a taser, even if the officer had valid authority to assist in confining Mann or had the lawful authority to act for the protection of Mann and others.  Indeed, taking Mann's version as true, she lay in her bed the entire time and

---

9.  Mann also argues that Darden could not have been performing a discretionary police function by essentially stepping in to help the hospital transport her to another facility, a task beyond the scope of his authority as a police officer.  The court need not address this argument.

39

exhibited no threatening or violent behavior. Even though Mann indicated that she did not want to be transferred and questioned why they were attempting to force her, that conduct could not have warranted the firing of electric prongs into her abdomen and the repeated injection of electric current throughout her body as she lay in her hospital bed shortly after doctors had become concerned about her potentially suicidal thoughts.

Even reading the facts as they are offered by Darden (and ignoring Mann's contention that she at all times remained in her bed), the court is convinced that the evidence could support the conclusion that the repeated use of the taser was grossly unreasonable. Mann was a 47-year-old woman in the intensive-care unit of a hospital who had not shown any signs of physical violence. Mann had insisted repeatedly on her privacy by closing the curtains as the officers stood around her hospital room and stated that she was getting up to close

**40**

the curtains immediately prior to Darden tasing her. As Mann reached for the curtain, which was over Emmanuel's shoulder, Darden tased her. According to Darden's version of events, Mann was attempting to close the curtains rather than attempting to harm anyone. Moreover, and quite telling, it is undisputed by any party that Darden removed his taser and warned Mann that he would tase her if she did not comply with the officers' orders <u>even before</u> she ever allegedly stood up to reach for the curtain. Indeed, as noted before, there is conflicting evidence about whether Mann was tased because of her disorderly conduct, her refusal to obey an order, her allegedly threatening behavior, or, in the words of Darden's initial report, her "noncompliance and passive resistance." Finally, and completely unjustified by any of the evidence, the record reflects a second five-second tasing after Mann had fallen back on her hospital bed.[10]   There is no assertion that she was

---

10.   While Darden describes only one tasing in his
(continued...)

41

threatening or disorderly at that point.  Even were
Darden able to justify immunity for the first tasing, he
has advanced no argument--nor does the evidence when read
in Mann's favor suggest--that he would be entitled to
discretionary-function immunity for the second.

Hospital patients, particularly those with potential
psychiatric issues, and including those in intensive
care, often become hostile and verbally abusive.  The
resort to the use of a taser could certainly be
considered by a jury to be an extreme action under these
circumstances.  This is not to say that Darden knew about
Mann's heart problems, her psychiatric diagnosis, her
surgically inserted stomach mesh, or any of her other
medical issues; instead it merely recognizes the inherent
dangers in resorting to such force in a hospital's
intensive-care unit.  Indeed, this case does not involve
taking Mann into <u>custody</u> or to <u>jail</u>, but rather,

_____

10.  (...continued)
affidavit, the other evidence, including Emmanuel's
testimony, indicates that Darden tased Mann again as she
lay in her bed after the first tasing.

transporting her to a psychiatric facility for evaluation based on concerns about suicide.

### iv.

Even were the court to find that Darden was acting within his discretionary authority--by, for example, concluding that any activity engaged in while an officer is ostensibly performing a job duty (such as an arrest or responding to an emergency to protect community members) is a "discretionary function"--Darden would not be entitled to immunity under Alabama law. Darden's actions, viewed in the light most favorable to Mann--a perspective that actually includes some of Darden's own admissions--were clearly so egregious as to pierce even his discretionary-function immunity. Officers are not entitled to discretionary-function immunity when their conduct is willful, malicious, fraudulent, in bad faith, beyond their authority, or under a mistaken

interpretation of the law.[11]  <u>Ex parte Butts</u>, 775 So.2d 173, 178 (Ala. 2000); <u>Ex parte Cranman</u>, 792 So.2d 392 (Ala. 2000).  Under the facts as noted above, which are admittedly inconsistent at times as narrated by the several parties, Darden's <u>repeated</u> tasing of Mann in her hospital bed could be seen by a jury as willful, malicious, in bad faith, and well beyond his authority.

***

For the foregoing reasons, it is ORDERED that:

(1) Defendants James A. Darden and Camille V. Emmanuel's motion for summary judgment (Doc. No. 31) is granted on plaintiff Sue-Zanne Mann's 42 U.S.C. § 1983 claim.

---

11.  This inquiry also differs from the analysis employed by federal courts.  Federal courts ask, instead, whether a clearly established right has been violated by the officer while acting within her discretionary authority.  <u>See, e.g.</u>, <u>Hope v. Pelzer</u>, 536 U.S. 730, 739-40 (2002).

44

(2) Summary judgment is entered favor of defendants Darden and Emmanuel and against plaintiff Mann on her § 1983 claim, with plaintiff Mann taking nothing as to that claim.

(3) Said motion is denied on plaintiff Mann's battery claim.

(4) Plaintiff Mann's battery claim will go to trial.

DONE, this the 2nd day of July, 2009.


 /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE